O

NO JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GIBSON GUITAR CORP., a Delaware corporation, | ) ) ) | Case No. CV 12-10870 DDP (AJWx) |
| Plaintiff, | ) ) | **ORDER GRANTING MOTION TO DISMISS** |
| v. | ) ) | [Dkt. No. 30] |
| VIACOM INTERNATIONAL INC., a Delaware corporation; JOHN HORNBY SKEWES & CO., LTD., a United Kingdom corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

Presently before the court is Defendant Viacom International Inc. ("Viacom")'s Motion to Dismiss Plaintiff's Amended Complaint for Failure to State a Claim on Which Relief May Be Granted. Having considered the parties' submissions and heard oral argument, the court adopts the following order.

**I. Background**

Plaintiff Gibson Guitar Corporation ("Gibson") owns trademarks to the Flying V Body Shape Design Trademark, the Flying V Peg-Head Design Trademark, and the word mark FLYING V. (FAC ¶ 14.) Defendant Viacom is a Delaware corporation that owns trademarks for

1  SpongeBob Squarepants and Nickelodeon.  (Id. ¶ 6.)  Defendant John
2  Hornby Skewes & Co. Ltd. ("JHS") is a United Kingdom corporation
3  that promotes and sells various products using the SPONGEBOB
4  trademarks.  (Id. ¶ 7.)  Plaintiff alleges that JHS has used
5  Plaintiff's Flying V trademarks without authorization.  (Id. ¶¶ 21-
6  32.)  Plaintiff makes the following factual allegations regarding
7  Viacom:

>    35. Upon information and belief, the Viacom License
> requires Defendant Viacom to monitor and control the
> quality and distribution of the JHS' Unauthorized
> Products containing the SPONGEBOB SQAREPANTS and
> NICKELODEON trademarks.
>    36. Upon information and belief, the Viacom License
> requires Defendant Viacom to monitor and control the
> quality and distribution of the JHS's Unauthorized
> Products containing the SPONGEBOB SQUAREPANTS and
> NICKELODEON trademarks. JHS is the distributor of the
> JHS's Unauthorized Products, and specifically pursuant to
> the License Agreement, Viacom controls, among other
> things, which products JHS can use Viacom's trademarks
> on, i.e. Ukuleles.  Viacom controls product approval, and
> JHS must report and notify Viacom of all sales outside
> the Licensed Territory.  A copy of this License Agreement
> is attached as Exhibit G.
>    37. Upon information and belief, Viacom had
> constructive knowledge that JHS' Unauthorized Products
> were infringing the Gibson Trademarks.  The Gibson
> Trademarks are all registered in the United States, one
> for over 30 years.  The Lanham Act requires the trademark
> owner to monitor the use of its own trademarks, including
> the use by third parties, or trademark rights could be
> lost.
>    38. Viacom has actual knowledge of the infringement
> of the Gibson Trademarks by JHS' Unauthorized Products.
> Gibson contacted Viacom on December 7, 2012, with a cease
> and desist letter describing the infringement of JHS'
> Unauthorized Products. A copy of this cease and desist
> letter is attached hereto as Exhibit H.
>    39. Despite its constructive and actual knowledge of
> the infringement of the Gibson Trademarks by JHS'
> Unauthorized Products, Viacom has continued to provide
> its intellectual property to JHS for use with JHS'
> Unauthorized Products.
>    40. Upon information and belief, Viacom
> intentionally induced JHS to infringe on Gibson
> Trademarks by controlling and approving products that
> infringe on Gibson Trademarks and obtaining license fees
> for such infringement.

2

41.  Upon information and belief, the aforementioned
     misuse of the Gibson Trademarks by Viacom was done with
     the intent of deceiving or misleading customers into
     mistakenly believing that said JHS' Unauthorized Products
     were authorized Gibson products originating from Gibson
     or its related companies and otherwise misappropriating
     the goodwill built up by Gibson in the Gibson Trademarks
     and otherwise attracting and misdirecting consumers
     looking for genuine or authorized Gibson goods to the JHS
     websites.

Based on these allegations, Plaintiff alleges that Viacom is contributorily and vicariously liable for JHS's infringement.

**II. Legal Standard**

A complaint will survive a motion to dismiss under Rule 12(b)(6) when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. Id. at 678 (citations and internal quotation marks omitted).

3

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 664. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555-56. "Determining whether a complaint states a plausible claim for relief" is a "context-specific" task, "requiring the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 663-64.

### III. Discussion

#### A. Contributory Infringement

"To be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." Id. at 807, citing Inwood Labs., Inc v. Ives Labs., Inc., 456 U.S. 844, 855 (1982). "When the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must 'consider the extent of control exercised by the defendant over the third party's means of infringement.' For liability to attach, there must be 'direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark.'" Id., quoting Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984 (9th Cir.1999)(alterations omitted).

"The tests for secondary trademark infringement are even more difficult to satisfy than those required to find secondary copyright infringement." Perfect 10, Inc. v. Visa Int'l Serv.

4

Ass'n, 494 F.3d 788, 806 (9th Cir. 2007). See also Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 439 n.19 (1984)(noting that "Inwood's narrow standard for contributory infringement" governs only trademark cases, not copyright cases, which has a broader contributory infringement standard).

### 1. Intentional Inducement

The standard for "intentional inducement" is fairly high. It requires that the contributory infringer do more than be able to "reasonably anticipate" the direct infringement. Inwood, 456 U.S. at 852 n.13. Thus, in Inwood, which concerned a drug manufacturer that produced "generic" capsules designed to duplicate the appearance of a trademarked drug, there was no intentional inducement where "incidents [of mislabeling] occurred too infrequently to justify the inference that the petitioners' catalogs and use of imitative colors had 'impliedly invited' druggists to mislabel" the generic drugs under a brand name. Id. at 853. Likewise, in Perfect 10, Inc. v. Visa International Service Association, payment processing for infringing Internet websites by credit card companies did not constitute intentional inducement of infringement even though it did provide "critical support" to infringing websites; Perfect 10 alleged no "affirmative acts by Defendants suggesting that third parties infringe Perfect 10's mark, much less induce them to do so." Perfect 10, 494 F.3d at 807.

Here, under the intentional inducement prong, Plaintiff alleges that "[u]pon information and belief, Viacom intentionally induced JHS to infringe on Gibson Trademarks by controlling and approving products that infringe on Gibson Trademarks and obtaining

5

license fees for such infringement." (FAC ¶ 40.) The issue is thus whether Viacom's "controlling and approving" infringing products and receipt of license fees for infringing products constitute intentional inducement.

In the first place, the control and approval exercised by Viacom do not appear to be "affirmative acts." Viacom retains the right to stop a product from being marketed and sold, but Plaintiff does not allege any facts suggesting that Viacom acted affirmatively in its relationship with JHS once the license agreement was signed. As in Perfect 10, "Defendants lend their names and logos" to the infringers "despite actual knowledge of the infringement," but these facts as pled do not "constitute a clear expression of a specific intent to foster infringement." 494 F.3d at 802 (internal quotation marks omitted). Like Perfect 10, Plaintiff here "has not alleged any 'specific acts' intended to encourage or induce infringement." Id.

Additionally, a certain amount of control is required for a valid trademark license agreement. "[W]hen the owner of a trademark licenses the mark to others, he retains a duty to exercise control and supervision over the licensee's use of the mark." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 992 (9th Cir. 2006)(internal citation and quotation marks omitted). The duty to supervise and control derives from trademark law rather than a given contract. Id. The purpose of requiring a licensor to retain such control is to protect consumers from deceptive use of a trademark. "If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective

6

protection against misleading uses of a trademark." Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959). Hence, "naked licensing, without any control over the quality of goods produced by the licensee, . . . is <u>inherently deceptive</u> and constitutes abandonment of any rights to the trademark by the licensor." Barcamerica Intern. USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 598 (9th Cir. 2002)(internal citations and quotation marks omitted).

    To hold that the amount of control required by a license agreement is sufficient to state a claim for contributory infringement by a licensor would expose every licensor to claims of contributory infringement for every license.  The purpose of requiring control by licensors is not to expose them to secondary liability but to protect consumers.[1]  Furthermore, expanding contributory infringement liability to all licensors would dilute the standard for contributory trademark infringement by lowering the bar for intentional inducement.  The court therefore finds that the control exerted by a licensor, without more, is not sufficient to state a claim for contributory trademark infringement.

    For these reasons, the claim for contributory infringement fails under the first prong.

---

[1] Since the requirement of quality control is intended to protect consumers from fraudulent or misleading use of a trademark, it makes little sense to extend that control beyond the use of that trademark to all aspects of a product.  Viacom is required to control its SPONGEBOB trademarks to ensure that a consumer does not purchase a product believing that it comes from the SpongeBob source and that it will be of the typical SpongeBob quality, only to find that it is an inferior product.  Viacom in its quality control is required to ensure that the product meets its own standards of quality, not to ensure that the product breaks no other law, including trademark infringement.

**2. Continued Supply to Known Infringer**

Under the second prong of the Inwood contributory infringement test, Plaintiff alleges that "Viacom had constructive knowledge that JHS's Unauthorized Products were infringing the Gibson Trademarks" by virtue of the U.S. registration of the Gibson Trademarks, and that "Viacom has actual knowledge of the infringement of the Gibson Trademarks by JHS' Unauthorized Products" by virtue of the cease and desist letter. (Id. ¶¶ 37-38.) "Despite its constructive and actual knowledge of the infringement of the Gibson Trademarks by JHS' Unauthorized Products, Viacom has continued to provide its intellectual property to JHS for use with JHS' Unauthorized Products." (Id. ¶ 39.) Plaintiff describes Viacom's licensing of its SPONGEBOB trademark to JHS as a "service" provided to JHS.[2] (Opp. at 14.)

Whether Viacom had actual or constructive knowledge of JHS's infringement, it must also have had the requisite control over the infringement in order to be held liable for contributory infringement. In Perfect 10, the Ninth Circuit considered whether providers of credit card services were liable for infringement by websites for whom they processed payments, and held that despite their knowledge of the websites' infringement, the credit card

---

[2] A license to use a trademark is not clearly either a service or a product. However, the Ninth Circuit advises that "when measuring and weighing a fact pattern in the contributory infringement context without the convenient 'product' mold dealt with in Inwood Lab, we consider the extent of control exercised by the defendant over the third party's means of infringement." Lockheed Martin Corp., 194 F.3d at 984. As this is the same as the test used to evaluate contributory infringement with respect to services, the court need not consider whether a trademark license is more like a product or a service.

8

payment networks were not liable because they lacked the requisite control.

> Perfect 10 has failed to allege facts sufficient to show direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark. Perfect 10 claims that the "product" or "instrumentality" at issue here is the credit card payment network through which Defendants process payments for infringing material. . . . [T]his network is not the instrument used to infringe Perfect 10's trademarks; that infringement occurs without any involvement of Defendants and their payment systems. Perfect 10 has not alleged that Defendants have the power to remove infringing material from these websites or directly stop their distribution over the Internet. At most, Perfect 10 alleges that Defendants can choose to stop processing payments to these websites, and that this refusal might have the practical effect of stopping or reducing the infringing activity. This, without more, does not constitute direct control.

Perfect 10, 494 F.3d at 807 (internal citations and quotation marks omitted).

Perfect 10 is distinguishable from the instant case insofar as there the alleged contributory infringers were providing an ancillary service to the direct infringers, whereas here, Viacom's "service" - the SPONGEBOB trademarks - appears on the infringing product itself. Here, instead of providing the means for consumers to purchase the infringing product, the infringing product bears Viacom's SPONGEBOB marks, which presumably create at least a part of the product's appeal.

Despite these differences, this case resembles Perfect 10 in important ways. As in Perfect 10, the "service" provided by Viacom - the SPONGEBOB trademark - is not the instrument of infringement; the infringing trademark is the FLYING V word mark and Flying V trademark body shape. Although Viacom's mark appears on an allegedly infringing product, Viacom's licensing of the SPONGEBOB

9

1  mark to JHS is not the instrument of infringement.  JHS apparently
2  makes non-infringing instruments using the SPONGEBOB mark, such as
3  a drum set and a guitar, and could make a non-infringing SpongeBob
4  ukulele.  Also as in Perfect 10, Viacom could bar JHS from selling
5  the SpongeBob SquarePants Flying V Ukulele, which would "have the
6  practical effect of stopping or reducing the infringing activity,"
7  id., but would not prevent JHS from designing and selling a Flying
8  V Ukulele without the SPONGEBOB mark, since the two marks are
9  independent.

10     Thus, when this court "consider[s] the extent of control
11  exercised by the defendant over the third party's means of
12  infringement," Lockheed Martin Corp., 194 F.3d at 984, it finds
13  that such control is lacking.  Although there are steps Viacom
14  could take to prevent allegedly infringing products from being
15  manufactured, marketed, and sold, these steps do not have a direct
16  connection to the infringement itself; JHS can infringe
17  independently of anything Viacom might do.  Combined with the
18  court's finding, above, that Plaintiff has not alleged that Viacom
19  has taken any affirmative steps to induce JHS to infringe, the
20  court finds that Plaintiff has not alleged facts sufficient to
21  state a claim for Viacom's contributory infringement.

22     **B. Vicarious Liability**

23     "Vicarious liability for trademark infringement requires a
24  finding that the defendant and the infringer have an apparent or
25  actual partnership, have authority to bind one another in
26  transactions with third parties or exercise joint ownership or
27  control over the infringing product."  Perfect 10, 494 F.3d at 807.
28  In support of this claim, Plaintiff has alleged that Viacom and JHS

10

exercise joint control based on the license agreement, which at minimum gives Viacom control over the licensed property, the licensed territory, and the licensed channels of distribution. (Opp. at 8; see redacted 2012 License Agreement, Bates Decl., Exh. A.). Plaintiff asserts that the full license agreements and additional discovery will reveal more factual bases for JHS and Viacom's joint control.

The court finds that the alleged control given to Viacom by the license agreement does not rise to the level of control necessary to give Viacom joint control or ownership sufficient to make Viacom vicariously liable for JHS's alleged infringement. As discussed above, Viacom can influence the allegedly infringing product by blocking its sale or by removing its mark from the product, but this does not give Viacom "the right or ability to control the actual infringing activity at issue in this case," namely, the production and sale of instruments that infringe. Viacom's type of control is only indirect.[3]

---

[3] Viacom's control is arguably more direct than in Perfect 10. There, the Ninth Circuit held that "Defendants cannot take away the software the offending websites use to copy, alter, and distribute the infringing images, cannot remove those websites from the Internet, and cannot themselves block the distribution of those images over the Internet. Defendants can refuse to process credit card payments for those images, but while this refusal would reduce the number of those sales, that reduction is the result of indirect economic pressure rather than an affirmative exercise of contractual rights." 494 F.3d at 805. Here, Plaintiff's ability to stop the sale of licensed products is arguably "an affirmative exercise of contractual rights," since it such ability is an exercise of rights described in a contract. However, as discussed above, those rights are required by trademark law for a valid license agreement, so they are distinguishable from affirmative rights granted by contract. Additionally, here there is no indication that such rights have any function in this contract beyond the purposes of establishing a valid license agreement. Thus, Viacom's ability to control JHS's products remains indirect,
(continued...)

Plaintiff asserts that "the extent to which Defendant Viacom exercises control over JHS pursuant to the Redacted July 2012 Viacom License Agreement is not fully known, as Defendant Viacom redacted a lion's share of the language from the Redacted July 2012 Viacom License Agreement. Furthermore, from the various copyright notices on Defendants' own infringing product, it appears that the Defendants began their relationship circa 2007 (five years prior to the July 2012 Viacom License Agreement)." (Opp. at 6.) Plaintiff thus argues that the complete license agreements from 2007 to 2012[4] and other discovery will reveal "MORE evidence of Defendant Viacom's misconduct in this case." (Opp. at 6-7.) However, Plaintiff has not alleged any facts that, taken as true, would constitute control sufficient to make Viacom vicariously liable; the control required by a license agreement is not sufficient. Because the license agreement and licensing relationship are the sole basis for Plaintiff's allegations against Viacom, the court finds that Plaintiff has failed to state a claim for vicarious infringement.

///
///
///
///

---

[3](...continued)
despite the contract.

[4] Plaintiff's FAC includes seven pages of the redacted license agreement between Viacom and JHS for the year 2012. In its reply brief, Viacom attached a more complete version of the 2012 and 2007 license agreements. Plaintiff's objection to the new evidence is SUSTAINED. The court declines to consider documents provided in a reply brief to which Plaintiff did not have previous access.

12

**B. Use in Commerce**

Because the court has found that Plaintiff has failed to state a claim for Viacom's secondary liability, it need not reach the issue of whether Plaintiff has stated a claim for use of the mark in U.S. commerce.

**IV. Conclusion**

For the reasons stated above, Viacom's Motion to Dismiss is GRANTED with prejudice.

IT IS SO ORDERED.

Dated: May 17, 2013

DEAN D. PREGERSON
United States District Judge